IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| ERRICK BOLDEN, | ) | CASE NO. 1:17 CV 318 |
| | ) | |
| Petitioner, | ) | |
| | ) | JUDGE JAMES S. GWIN |
| v. | ) | |
| | ) | MAGISTRATE JUDGE DAVID A. RUIZ |
| WARDEN, Marion Correctional Inst., | ) | |
| | ) | |
| Respondent. | ) | **REPORT AND RECOMMENDATION** |

### INTRODUCTION

Petitioner Errick Bolden, a prisoner in state custody, has filed a *pro se* petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254, challenging the constitutionality of his convictions and sentences in *State v. Bolden*, Case No. 14-CR-000161. (R. 1.) Respondent Warden of Marion Correctional Institution[1] has filed a return of writ. (R. 7.) Bolden has filed a traverse. (R. 9.) And Respondent has filed a sur-reply. (R. 12.)

This matter is before the undersigned by an automatic order of reference under Local Rule 72.2 for preparation of a report and recommendation on Bolden's petition or other case-dispositive motions. For the reasons stated below, the court recommends Bolden's petition be denied.

---

[1] Lyneal Wainwright is the warden of the Marion Correctional Institution in Marion, Ohio, where Bolden is incarcerated. (R. 7 at 1.)

1

**FACTUAL BACKGROUND**

Ohio's Eleventh District Court of Appeals set forth the following facts underlying

Bolden's convictions:

{¶ 13} The case proceeded to jury trial on September 8, 2014. Cathylean Crutcher testified she lives in a two-story townhouse in Seneca Grove, an apartment complex in Painesville. She said she lives alone with her three young children from a prior relationship. As of February 2014, she had been dating appellant for two months.

{¶ 14} Ms. Crutcher said that her close friend and neighbor, Kasey Acree, lives in another townhouse across the street in the complex. She said that Ms. Acree was dating Ms. Crutcher's brother, Brandon.

{¶ 15} Ms. Crutcher said that on February 21, 2014, at about 9:00 p.m., she picked up appellant at his friend's house. She could tell appellant had been drinking.

{¶ 16} Ms. Crutcher drove back to Seneca Grove and parked in a parking lot near her apartment. While she was parking, Ms. Acree drove into the complex with Brandon and pulled up next to her and appellant. Ms. Acree asked them if they wanted to come over to play dominoes and to have a few drinks and they agreed. Appellant went with them to buy a bottle of alcohol, and Ms. Crutcher waited for them in her apartment. At the time, her children were visiting their father at his home.

{¶ 17} When Ms. Acree, Brandon, and appellant returned, Ms. Crutcher joined them at Ms. Acree's apartment. While Brandon was setting up the dominoes on a table, appellant kept knocking them off onto Brandon's lap and the floor. Ms. Crutcher noticed that Brandon was becoming increasingly irritated with appellant's behavior. Because appellant was acting obnoxiously, Ms. Crutcher left Ms. Acree's apartment and appellant followed her to her home.

{¶ 18} Ms. Crutcher said that when she and appellant entered her apartment, she told him she had received a letter from the property manager advising her that, due to some recent incidents, appellant was no longer permitted to enter her apartment and that if he did, he would be trespassing.

{¶ 19} Ms. Crutcher then went upstairs to her bedroom and put her phone on the charger. After she went downstairs, her phone rang and appellant saw the call was from the father of Ms. Crutcher's children. Appellant started screaming obscenities at her. He yelled, "your f phone is ringing. It's your f baby daddy. B----, you probably been sucking his d--- all day."

2

{¶ 20} These comments angered Ms. Crutcher. She went upstairs to her bedroom and answered the phone. It was her son who used his father's phone to call her.

{¶ 21} After talking to her son. Ms. Crutcher told appellant he needed to mind his own business. With that, appellant "got into [Ms. Crutcher's] face." He grabbed her shirt and pulled her onto the floor. He took hold of her neck and choked her, resulting in visible red marks and bruising all around her neck. The state presented photographs documenting this injury.

{¶ 22} Ms. Crutcher told appellant to let her go, but he continued to choke her. In an effort to break away, she reached up and grabbed him. She got free and told appellant to leave. She told him she wanted her phone, but he did not give it to her so she went downstairs and left the house. As she left, she told him she was going to put him out of the house.

{¶ 23} Ms. Crutcher went to Ms. Acree's apartment and asked to borrow her phone. She said that appellant had her phone and would not give it to her.

{¶ 24} While walking to her front porch, Ms. Crutcher dialed her phone number on Ms. Acree's phone. At the same time, she saw appellant had put her television outside and was in the process of putting her second television on the side of the building. While he was doing this, she heard her phone ringing and saw her phone lighting up in appellant's pocket. She took her phone from his pocket and said, "you're not leaving with my phone."

{¶ 25} Appellant grabbed Ms. Crutcher's hand. She had both her phone and Ms. Acree's phone in her hand. She said appellant was trying to "snatch" Ms. Acree's phone. While Ms. Crutcher was struggling with appellant trying to keep Ms. Acree's phone, she told him to let go of the phone. She eventually pulled away from appellant and ran into her apartment. However, appellant was right behind her at the door. She tried to shut the door on him and said, "you're not coming in here." Appellant was trying to get past the door and Ms. Crutcher was trying to close the door on him to keep him out. Suddenly, appellant grabbed her and then punched her with a closed fist in the jaw on the right side of her face.

{¶ 26} Ms. Crutcher heard her jaw crack and went to Ms. Acree's apartment. She asked her to call the police for an ambulance. Ms. Crutcher could not call herself because she was in great pain and was holding her jaw in place.

{¶ 27} Meanwhile, Brandon went to Ms. Crutcher's apartment looking for appellant, but he was gone. The police and ambulance arrived about two minutes later.

{¶ 28} Officer Brian Avery of the Painesville Police Department testified that at 11:00 p.m., he was dispatched to investigate an assault committed by a male named Errick Bolden against a female.

{¶ 29} As Officer Avery approached the apartment complex, he saw a male who he recognized as appellant walking on the street away from the complex. Appellant told him he was walking to Seneca Grove, but this was inconsistent with the direction Officer Avery saw him walking. In response to the officer's questions, appellant denied having been at the apartment complex recently or having been involved in an incident there that evening. Officer Avery detected an odor of alcoholic beverage on him.

{¶ 30} Officer Avery said he transported appellant to the scene. At that time, Ms. Crutcher was in front of her apartment. Although she was in great pain, she told Officer Avery that appellant had injured her severely enough that she thought her jaw was broken. The officer then arrested appellant.

{¶ 31} Captain Robert Mrosko, a paramedic with the Painesville Fire Department, testified that Ms. Crutcher's right jaw was swollen and deformed. He said she was crying and obviously in great pain. He said that once he and his partners put Ms. Crutcher on a stretcher and brought her inside the ambulance, they put her head in a cervical collar to stabilize her jaw.

{¶ 32} Ms. Crutcher was taken by ambulance to Tri−Point Medical Center in Concord. Before she was seen by medical staff, Officer Avery met her in the hospital. She could not write out a statement because she was in such great pain. She also had difficulty speaking and could only speak through her teeth. She told Officer Avery what had happened and he wrote out her statement. Ms. Crutcher read and signed it.

{¶ 33} Ms. Crutcher's emergency room nurse, Maria Lazuka, testified she gave her morphine twice, but the pai[n] was so intense, it did not help so, finally, she gave her Dilaudid, which eased her pain.

{¶ 34} Dr. Frank Greicius, the radiologist who read the CT scan, said Ms. Crutcher sustained a horizontal fracture through the mandible or jaw bone. He said the mandible is a sturdy bone, and it would take a "good blow" to break it. He said this injury was "significant" and would not have resulted from bumping against a hard object, such as a refrigerator. He said Ms. Crutcher's injuries required surgery during which the fracture fragments were fastened together with a metal plate to allow her bone to fixate and heal properly. The state presented photographs of Ms. Crutcher's jaw prior to and post-surgery.

4

{¶ 35} Since the injury, Ms. Crutcher has had many problems with her jaw. As of the trial date, which was seven months after the assault, her mouth was still numb from her jaw to her lips. As a result, she cannot eat properly. Her surgeon advised her that she sustained nerve damage from the assault and he had no idea when the numbness will subside.

{¶ 36} After Ms. Crutcher had surgery, appellant started sending her letters and calling her from jail. As a result, on February 24, 2014, she obtained a protection order from the Painesville Municipal Court, requiring appellant to cease all contact with her. However, despite this order, he continued to send her letters nearly every other day and to call her from jail.

{¶ 37} Captain Ron Walters, Detective Bureau Commander for the Lake County Sheriff's Office, testified that when an inmate attempts to call a person outside of the jail, before the call can proceed, a tape-recorded message is played for the recipient advising him that an inmate at the jail is attempting to call him and that if he wishes to accept the call, he must so indicate by pressing a number. Captain Walters said that between the date appellant was arrested, February 21, 2014, and the date trial began, September 8, 2014, appellant tried to call Ms. Crutcher 1,109 times and she did not accept any of these calls.

{¶ 38} As a result, appellant resorted to another plan to make telephone contact with her. He would call one of his friends or relatives from jail, and, after they accepted the call, he would have that person call Ms. Crutcher while appellant waited on the line. Once Ms. Crutcher was on the line, appellant would call her "Bae," and talk to her like she was his girlfriend. Each time, she told him that she was not his "bae" and that he was not supposed to be calling her. Ms. Crutcher said appellant continued to make such calls up to the night before the trial began.

{¶ 39} In the 50 or so letters appellant sent to Ms. Crutcher from jail, several of which were offered in evidence, appellant told her to "get this case off me." He said if she did, he would buy her a house, cars, and clothes. He told her to tell the prosecutor that this was an accident caused by a fall and that she was upset with appellant because she thought he was talking to his wife. He told her what she had to do and say to recant her testimony. He told her to write a statement saying this was an accident and to send a copy to the Judge and prosecutor. Ms. Crutcher testified she refused to do so.

{¶ 40} Ms. Crutcher said that she never fell at any time during the struggle at the front door and that this was no accident. She said appellant was in a fit of rage because he thought her children's father had called her. She said that since this incident, she made no effort to communicate with him.

{¶ 41} During Ms. Crutcher's testimony, appellant blurted out that he did not want his attorney to represent him. Despite the court's admonition, he told the judge he would not keep quiet. As a result, the court made him observe the trial and communicate with his attorney in a secured conference room until he agreed to behave.

{¶ 42} Although appellant's counsel strongly urged appellant on the record not to testify due to his extensive criminal record, appellant chose to testify on his own behalf. Once appellant took the stand, he told the judge he wanted to ask the jury questions during his testimony. When the court explained to appellant that the court's procedure required him to only answer the attorneys' questions, appellant said in front of the jury, "you all have evidence you won't give me." Later, when his attorney explained to him that he could not repeat hearsay testimony, appellant said in front of the jury, "He against me."

{¶ 43} Appellant admitted he has a lengthy criminal record and is currently on post-release control. In 2011, he was convicted of attempted felonious assault, a third-degree felony. He was released from prison in 2013, and was on post-release control when he committed the instant offense.

{¶ 44} Appellant's testimony was internally inconsistent and confusing. He testified that after he and Ms. Crutcher left Ms. Acree's apartment, they never got into an argument that night. He said that Ms. Crutcher never touched him, yet, he also said that Ms. Crutcher grabbed his phone and started hitting and kicking him in the doorway.

{¶ 45} Appellant said that at one point, they slipped in the doorway, but neither of them ever fell or hit the ground. He said he does not know how Ms. Crutcher injured her jaw, but that he never punched her. He said he did not know if she hit her head on anything.

{¶ 46} On cross-examination, appellant admitted he wrote letters from jail to Ms. Crutcher saying he was jealous and asking her to change her testimony.

{¶ 47} Appellant also admitted that on April 25, 2014, one week before the first scheduled trial date, he made a telephone call from jail to his friend, Ralph Martin, and asked Martin to call appellant's daughter, appellant's friend, and appellant's uncle, telling them to call Ms. Crutcher and to tell her not to "go to court against" him.

{¶ 48} Appellant said he never received a protection order requiring him to have no contract with Ms. Crutcher. However, when the prosecutor showed him the protection order and his signature on it indicating he was served with it in court, he admitted he received it. He also admitted that, although he knew he was ordered to

have no contact with Ms. Crutcher, he continued to phone and write her letters trying to get her to either not go to court or to change her testimony.

*State v. Bolden*, No. 2014-L-121, 2016 WL 3573879, at *2-6 (Ohio Ct. App. June 30, 2016).

These facts "shall be presumed to be correct," and Bolden has the burden of rebutting the presumption of correctness by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Warren v. Smith*, 161 F.3d 360-61 (6th Cir. 1998).

## PROCEDURAL BACKGROUND

### A.    Trial Court

On April 7, 2014, the Lake County Grand Jury indicted Bolden on two charges: one count of felonious assault in violation of Ohio Rev. Code § 2903.11(A)(1) and one count of petty theft in violation of Ohio Rev. Code § 2913.02(A)(1). (R. 7-1, Ex. 1.) Bolden entered pleas of not guilty to both charges. (R. 7-1, Ex. 2.)

On April 23, 2014, Bolden filed a *pro se* motion to dismiss his attorney, an assistant Lake County Public Defender. (R. 7-1, Ex. 3.) On April 29, 2014, Bolden, through his attorney, filed a motion for a competency evaluation. (R. 7-1, Ex. 4.) That same day, the trial court held a hearing on Bolden's motion to dismiss his counsel. (R. 7-1, Ex. 5.) On April 30, 2014, the trial court issued an order denying the motion for new counsel. (*Id.*) Also on April 30, 2014, Bolden filed a second, virtually identical motion to dismiss his attorney. (R. 7-1, Ex. 6.) As in the prior motion, he requested a psychological evaluation and stated that he was diagnosed as bipolar and schizophrenic, suffered from paranoia, and had not taken his medication since July 2013. (*Id.*)

On May 5, 2014, the trial court granted Bolden's motion for a competency evaluation, and referred him to the Lake County Adult Probation Department to be assessed by Dr. Jeffrey

7

Rindsberg. (R. 7-1, Exs. 7, 8.) The court scheduled a competency hearing for June 12, 2014. (R. 7-1, Ex. 7.)

On May 7, 2014, Dr. Rindsberg prepared a report stating that, due to Bolden's unwillingness to cooperate, he was unable to assess Bolden's competence to stand trial. (R. 7-1, Ex. 8.) On June 5, 2014, upon the recommendation of Dr. Rindsberg, the court ordered that Bolden be evaluated at Northcoast Behavioral Healthcare, and continued the June 12, 2014 competency hearing to July 15, 2014. (R. 7-1, Exs. 8, 9.) Dr. Kristi Osterling of Northcoast Behavioral Healthcare stated in her report that Bolden "was uncooperative and malingering," but nevertheless concluded he was competent to stand trial. (R. 7-1, Ex. 9 at 20.)

The court conducted a competency hearing on July 15, 2014. (*Id*.) At the hearing, Bolden's counsel stated that after reviewing Dr. Osterling's report, he had no basis to question it. (*Id*.) Bolden himself, however, disputed the report, so the court referred him for another competency evaluation by Dr. James Eisenberg. (*Id*.) The court scheduled another competency hearing for August 25, 2014, and, in the event the court found Bolden to be competent, the trial was rescheduled to September 8, 2014. (R. 7-1, Ex. 9 at 21.)

On July 25, 2014, Bolden filed a *pro se* motion to dismiss the case, alleging his speedy trial rights were violated. (R. 7-1, Ex. 30 at 214.) The State opposed the motion. (R. 7-1, Ex. 10.)

Dr. Eisenberg then verbally notified the court that he had met with Bolden to conduct a competency evaluation, but that Bolden refused to cooperate. *Bolden*, 2016 WL 3573879, at *1. As a result, the court scheduled the case for a status hearing on August 1, 2014. *Id*.

On August 5, 2014, the trial court issued an order finding that, based on Dr. Osterling's report and defense counsel's stipulation to the report, Bolden was competent to stand trial. (R. 7-

8

1, Ex. 11 at 31.) It also struck Bolden's motion to dismiss because Bolden was represented by counsel, and, in the alternative, because the trial delays were attributable to Bolden and because he was also being held on a post-release control violation. (R. 7-1, Ex. 11 at 31-33.) The court stated that Bolden had been "'gaming the system' to exploit the rules in order to request dismissal on speedy trial grounds." (R. 7-1, Ex. 11 at 31.)

The case proceeded to a jury trial on September 8, 2014. (R. 7-1, Ex. 32 at 211.) On September 10, 2014, the jury found Bolden guilty of felonious assault. (R. 7-1, Ex. 12.) The State had dismissed the petty theft charge before trial. (R. 7-1, Ex. 12.)

On October 28, 2014, the trial court held a sentencing hearing. (R. 7-1, Ex. 13.) It sentenced Bolden to eight years' imprisonment. (*Id*.) The court also found Bolden was on post-release control at the time he committed the offense and sentenced him to an additional term of one year for the post-release control violation, to be served prior to and consecutive to the other sentence, for a total prison term of nine years. (R. 7-1, Ex. 13.)

### B. Direct Appeal

On December 11, 2014, Bolden, through new counsel, filed a motion for leave to file a delayed appeal. (R. 7-1, Ex. 14.) He argued that due to an unknown error, appellate counsel was not appointed until after the time for appeal had expired. (*Id*.) The court of appeals appointed counsel for Bolden and granted his motion. (R. 7-1, Exs. 15, 16.)

In his appellate brief, Bolden raised the following assignments of error:

1. The trial court erred by failing to instruct the jury on the lesser included offense of assault.

2. The trial court erred to the prejudice of the Defendant-Appellant when it denied his repeated requests for substitute counsel.

9

3. The trial court erred to the prejudice of the Defendant-Appellant when it returned a verdict of guilty against the manifest weight of the evidence.

4. The trial court erred to the prejudice of the Defendant-Appellant in denying his Motion for Acquittal made pursuant to Crim. R. 29(A).

(R. 7-1, Ex. 17.) The State filed a brief in response. (R. 7-1, Ex. 18.) On June 30, 2016, the Ohio appellate court affirmed the trial court's judgment. (R. 7-1, Ex. 19.)

On July 28, 2016, Bolden, acting *pro se*, filed a timely notice of appeal of the appellate court's judgment in the Ohio Supreme Court. (R. 7-1, Ex. 20.) In his memorandum in support of jurisdiction, he raised the following propositions of law:

1. Trial court erred by failing to instruct the jury on the lesser included offense of assault. 6th and 14th Amendment violation[s].

2. Trial court erred to the prejudice of the Defendant when it denied his repeated requests to substitute counsel. In violation of 5th and 14th Amendment of the U.S. Constitution.

3. The trial court erred to the prejudice of the Defendant when it returned a verdict of guilty against the manifest weight of the evidence. In violation of the 6th and 5th and 14th Amendments to the U.S. Constitution.

4. The trial court erred to the prejudice of the Defendant in denying his motion for acquittal made pursuant to Criminal Rule 29. In violation of his 5th, 6th, and 14th Amendments to the U.S. Constitution[,] due process and a fair and impartial trial.

(R. 7-1, Ex. 21 (capitalization altered).) The State filed a memorandum in response. (R. 7-1, Ex. 22.) On November 23, 2016, the Ohio Supreme Court declined to accept jurisdiction over the appeal and dismissed the case. (R. 7-1, Ex. 23.)

### C. Post-Conviction Proceedings

#### 1. Petition to Vacate or Set Aside Judgment of Conviction or Sentence

10

Meanwhile, on February 17, 2015, Bolden, acting *pro se*, filed a petition to vacate or set aside judgment of conviction or sentence in the trial court. (R. 7-1, Ex. 24.) The trial court ordered the petition stricken from the record for failing to include a certificate of service. (R. 7-1, Ex. 25.) According to the trial court's docket, Bolden did not appeal the court's judgment.

### 2.      Petition for Writ of Habeas Corpus

On April 15, 2015, Bolden, acting *pro se*, filed a petition for writ of habeas corpus in the state appellate court. (R. 7-1, Ex. 26.) The State moved to dismiss the petition. (R. 7-1, Ex. 27.) On June 30, 2015, the appellate court granted the State's motion and dismissed the petition. (R. 7-1, Ex. 28.) According to the court of appeals' docket, Bolden did not appeal the court's judgment.

### 3.      Application to Reopen Direct Appeal

On October 3, 2016, Bolden, again acting *pro se*, filed in the state appellate court an untimely application to reopen his direct appeal pursuant to Ohio Appellate Rule 26(B). (R. 7-1, Ex. 29.) He argued that his appellate counsel was ineffective for failing to include in the record on appeal a copy of the transcript from a pretrial hearing in which his motion to dismiss counsel was addressed. (*Id.*) The State opposed the application. (R. 7-1, Ex. 30.) On November 28, 2016, the state appellate court denied the application as untimely because Bolden failed to show good cause for his delay in filing the petition. (R. 7-1, Ex. 24.) The court further found that even if the application were timely filed, it would still lack merit, because the court did in fact review the record in considering Bolden's claim and found no evidence he was entitled to substitute counsel or prejudiced by counsel's failure to file the transcript. (R. 7-1, Ex. 24 at 207.) According to the court of appeals' docket, Bolden did not appeal the court's judgment.

## FEDERAL HABEAS CORPUS

Bolden filed the *pro se* petition for writ of habeas corpus now before this court on February 15, 2017. (R. 1.) He asserts the following grounds for relief:

1. The trial court erred by failing to instruct the jury on the lesser included offense of assault.

2. The trial court erred to the prejudice of the [D]efendant-[A]ppellant when it denied his repeated requests to substitute counsel.

3. The trial court erred to the prejudice of the Defendant-Appellant when it returned a verdict of guilty against the manifest weight of the evidence.

4. The trial court erred to the prejudice of the Defendant-Appellant in denying his motion for acquittal made pursuant to [Crim. R.] 29(A).

(R. 1-1.)[2]

Respondent filed a return of writ (R. 7), Bolden filed a traverse (R. 9), and Respondent filed a sur-reply. (R. 12.) Bolden has also filed three motions for "cause supplication," seeking to add two attorney grievance letters, twenty-eight (28) pages of medical records, and a letter from the Social Security Administration to the evidence of record. (R. 15, 18, 19.) Respondent

---

[2] In his traverse, Bolden appears to raise numerous additional grounds for relief, including: (1) ineffective assistance of counsel and state-court error related to assistance from a psychiatric expert; (2) the State's improper failure to disclose exculpatory evidence; (3) ineffective assistance of counsel relating to the suppression of evidence and failure to object; (4) trial-court error in limiting cross-examination of witnesses; (5) ineffective assistance of counsel and trial-court error relating to the failure to advise Bolden of time limits for filing a timely appeal; and (6) the State's failure to provide him with a transcript. (R. 9 at 2, 19-21.) The court, however, declines to address habeas claims first presented in a petitioner's traverse rather than his petition. *See Taylor v. Mitchell*, 416 F.3d 500, 504 (6th Cir. 2005). In addition, Bolden submits with his traverse certain medical records. (R. 9-1.) The court cannot consider these records, however, because a habeas court's "review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits." *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011).

opposed the motions. (R. 17, 20.) This court denied the motions, stating that exhibits would be considered to the extent they were part of the record. (R. 21.) Thereafter, Bolden moved for appointment of counsel, which the court also denied. (R. 22, 23.)

STANDARDS OF REVIEW

**A.     AEDPA Review**

Bolden's petition for writ of habeas corpus is governed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), as it was filed after the Act's 1996 effective date. *Lindh v. Murphy*, 521 U.S. 320, 336 (1997); *Murphy v. Ohio*, 551 F.3d 485, 493 (6th Cir. 2009). The Act "recognizes a foundational principle of our federal system: State courts are adequate forums for the vindication of federal rights." *Burt v. Titlow*, 134 S. Ct. 10, 15 (2013). It therefore "erects a formidable barrier to federal habeas relief for prisoners whose claims have been adjudicated in state court." *Id.*

One of AEDPA's most significant limitations on district courts' authority to grant writs of habeas corpus is found in § 2254(d). That provision forbids a federal court from granting habeas relief with respect to a "claim that was adjudicated on the merits in State court proceedings" unless the state-court decision either:

1.     resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

2.     resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

Habeas courts review the "last *explained* state-court judgment" on the federal claim at issue. *Ylst v. Nunnemaker*, 501 U.S. 797, 805 (1991) (emphasis original). A state court has

13

adjudicated a claim "on the merits," and AEDPA deference applies, regardless of whether the state court provided little or no reasoning at all for its decision. *Harrington v. Richter*, 562 U.S. 86, 99 (2011).

"Clearly established Federal law" for purposes of § 2254(d)(1) "is the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision." *Lockyer v. Andrade*, 538 U.S. 63, 71-72 (2003). It includes "only the holdings, as opposed to the dicta, of [Supreme Court] decisions." *White v. Woodall*, 134 S. Ct. 1697, 1702 (2014) (internal quotation marks and citations omitted). The state-court decision need not refer to relevant Supreme Court cases or even demonstrate an awareness of them; it is sufficient that the result and reasoning are consistent with Supreme Court precedent. *Early v. Packer*, 537 U.S. 3, 8 (2002) (per curiam). A state-court decision is contrary to "clearly established Federal law" under § 2254(d)(1) only "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 412-13 (2000). And "review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits." *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011).

A state-court decision is an "unreasonable determination of the facts" under § 2254(d)(2) only if the court made a "clear factual error." *Wiggins v. Smith*, 539 U.S. 510, 528-29 (2003). The petitioner bears the burden of rebutting the state court's factual findings "by clear and convincing evidence." *Burt*, 134 S. Ct. at 15; *see also Rice v. White*, 660 F.3d 242, 250 (6th Cir. 2011). This requirement mirrors the "presumption of correctness" AEDPA affords state-court

14

factual determinations, which only can be overcome by clear and convincing evidence. 28 U.S.C. § 2254(e)(1). The Supreme Court has cautioned, "'a state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance.'" *Burt*, 134 S. Ct. at 15 (quoting *Wood v. Allen*, 558 U.S. 290, 301 (2010)).

Indeed, the Supreme Court repeatedly has emphasized that § 2254(d), as amended by AEDPA, is an intentionally demanding standard, affording great deference to state-court adjudications of federal claims. A petitioner, therefore, "must show that the state court's ruling . . . was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington*, 562 U.S. at 103. This is a very high standard, which the Court readily acknowledges: "If this standard is difficult to meet, that is because it is meant to be." *Id.* at 102.

### B.      Exhaustion and Procedural Default

Under AEDPA, state prisoners must exhaust all possible state remedies, or have no remaining state remedies, before a federal court will review a petition for a writ of habeas corpus. 28 U.S.C. § 2254(b) and (c); *see also Rose v. Lundy*, 455 U.S. 509 (1982). This entails giving the state courts "one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process." *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999). In other words, "the highest court in the state in which the petitioner was convicted [must have] been given a full and fair opportunity to rule on the petitioner's claims." *Manning v. Alexander*, 912 F.2d 878, 881 (6th Cir. 1990).

15

Procedural default is a related but distinct concept from exhaustion. *Williams v. Anderson*, 460 F.3d 789, 806 (6th Cir. 2006). Procedural default occurs when a habeas petitioner fails to obtain consideration of a federal constitutional claim by state courts because he failed to: (1) comply with a state procedural rule that prevented the state courts from reaching the merits of the petitioner's claim; or (2) fairly raise that claim before the state courts while state remedies were still available. *See, e.g., Wainwright v. Sykes*, 433 U.S. 72, 80, 84-87 (1977); *Engle*, 456 U.S. at 125 n.28; *Williams*, 460 F.3d at 806. In determining procedural default, the federal court again looks to the last explained state-court judgment. *Ylst*, 501 U.S. at 805; *Combs v. Coyle*, 205 F.3d 269, 275 (6th Cir. 2000).

Where a state court declines to address a prisoner's federal claims because the prisoner has failed to meet a state procedural requirement, federal habeas review is barred as long as the state judgment rested on "independent and adequate" state procedural grounds. *Coleman v. Thompson*, 501 U.S. 722, 729 (1991). To be independent, a state procedural rule and the state courts' application of it must not rely in any part on federal law. *Id.* at 732-33. To be adequate, a state procedural rule must be "'firmly established' and 'regularly followed'" by the state courts at the time it was applied. *Beard v. Kindler*, 558 U.S. 53, 60-61 (2009).

A petitioner also may procedurally default a claim by failing to raise the claim in state court, and pursue the claim through the state's "ordinary appellate review procedures," if, at the time of the federal habeas petition, state law no longer allows the petitioner to raise the claim. *Williams*, 460 F.3d at 806 (quoting *O'Sullivan*, 526 U.S. at 848); *see also Baston v. Bagley*, 282 F. Supp. 2d 655, 661 (N.D. Ohio 2003) ("Issues not presented at each and every level [of the state courts] cannot be considered in a federal habeas corpus petition."). Under these

16

circumstances, while the exhaustion requirement is technically satisfied because there are no longer any state-court remedies available to the petitioner, the petitioner's failure to have the federal claims fully considered in the state courts constitutes a procedural default of those claims, barring federal habeas review. *Williams*, 460 F.3d at 806.

Furthermore, to "fairly present" a claim to a state court, a petitioner must assert both its legal and factual basis. *Williams*, 460 F.3d at 806 (citing *McMeans v. Brigano*, 228 F.3d 674, 681 (6th Cir. 2000)). Most importantly, a "'petitioner must present his claim to the state courts as a federal constitutional issue - not merely as an issue arising under state law.'" *Id.* (quoting *Koontz v. Glossa*, 731 F.2d 365, 368 (6th Cir. 1984)).

A petitioner may overcome procedural default by demonstrating cause for the default and actual prejudice that resulted from the alleged violation of federal law, or that there will be a "fundamental miscarriage of justice" if the claim is not considered. *Coleman*, 501 U.S. at 750. "'[C]ause' under the cause and prejudice test must be something external to the petitioner, something that cannot be fairly attributed to him." *Id.* "[T]he existence of cause for a procedural default must ordinarily turn on whether the prisoner can show that some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule." *Id.* "A fundamental miscarriage of justice results from the conviction of one who is 'actually innocent.'" *Lundgren v. Mitchell*, 440 F.3d 754, 764 (6th Cir. 2006) (citing *Murray v. Carrier*, 477 U.S. 478, 496 (1986)).

### C. Cognizability

To the extent that claims asserted in federal habeas petitions allege state-law violations, they are not cognizable on federal habeas review and should be dismissed on that basis. "It is not

the province of a federal habeas court to reexamine state-court determinations on state-law questions. In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." *Estelle v. McGuire*, 502 U.S. 62, 68 (1991) (citing 28 U.S.C. § 2241); *see also Lewis v. Jeffers*, 497 U.S. 764, 780 (1990) ("[F]ederal habeas corpus relief does not lie for errors of state law."); *Engle v. Isaac*, 456 U.S. 107, 121 n.21 (1982) ("We have long recognized that a 'mere error of state law' is not a denial of due process.") (citation omitted)).

State-court rulings on issues of state law may, however, "rise to the level of due process violations [if] they 'offend[] some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental.'" *Seymour v. Walker*, 224 F.3d 542, 552 (6th Cir. 2000) (quoting *Montana v. Egelhoff*, 518 U.S. 37, 43 (1996)). But they must be "so egregious that [they] result in a denial of fundamental fairness." *Bugh v. Mitchell*, 329 F.3d 496, 512 (6th Cir. 2003). Fundamental fairness under the Due Process Clause is compromised where "the action complained of . . . violates those 'fundamental conceptions of justice which lie at the base of our civil and political institutions,' . . . and which define 'the community's sense of fair play and decency.'" *Dowling v. United States*, 493 U.S. 342, 353 (1990) (internal citations omitted). The Supreme Court, therefore, "ha[s] defined the category of infractions that violate 'fundamental fairness' very narrowly." *Id*. at 352.

### ANALYSIS

**A.**      **Ground for Relief One:** *Jury Instruction*

For his first ground for relief, Bolden claims the trial court erred by failing to instruct the jury on the lesser-included offense of assault. (R. 1-1; R. 9 at 8-10.) Respondent argues this claim is not cognizable on federal habeas review. (R. 7 at 13-15.) The court agrees.

Errors in jury instructions generally do not rise to the level of federal constitutional violations. In criminal trials, the State must prove every element of an offense, and a jury instruction violates due process if it fails to meet that requirement. *Middleton v. McNeil*, 541 U.S. 433, 437 (2004) (citing *Sandstrom v. Montana*, 442 U.S. 510, 520-21 (1979)). But the Supreme Court has emphasized that "not every ambiguity, inconsistency, or deficiency in a jury instruction rises to the level of a due process violation." *Id*. Indeed, "the circumstances that would induce a federal court to overturn the state court determination" regarding a requested jury instruction "would need to be extraordinary." *Bagby v. Sowders*, 894 F.2d 792, 795 (6th Cir. 1990).

More specifically, "the Supreme Court . . . has never held that the Due Process Clause requires instructing the jury on a lesser included offense in a non-capital case." *McMullan v. Booker*, 761 F.3d 662, 667 (6th Cir. 2014); *see also Campbell v. Coyle*, 260 F.3d 531, 541 (6th Cir. 2001) ("[T]he Constitution does not require a lesser-included offense instruction in non-capital cases."). The Sixth Circuit, therefore, has concluded that a failure to instruct on a lesser-included offense in a non-capital case is not "an error of such character and magnitude to be cognizable in federal habeas corpus review . . . ." *Bagby v. Sowders*, 894 F.2d 792, 797 (6th Cir. 1990) (finding failure to instruct on lesser-included offense is not "such a fundamental defect as inherently results in a miscarriage of justice or an omission inconsistent with the rudimentary demands of fair procedure").

19

Accordingly, Bolden's first ground for relief is not cognizable on federal habeas review, and the court recommends that it be dismissed.

### B.  Ground for Relief Two: *Requests for Substitute Counsel*

Bolden's second ground for relief contends the trial court erred when it denied his requests for new counsel. (R. 1-1; R. 9 at 11-12.) Respondent argues this claim is procedurally defaulted. (R. 7 at 22-25.)

The state appellate court was the last state court to consider this claim, reasoning:

{¶ 58} For his second assigned error, appellant alleges:

{¶ 59} "The trial court erred to the prejudice of the defendant-appellant when it denied his repeated requests for substitute counsel."

{¶ 60} Appellant filed two motions to dismiss his counsel, each being an exact copy of the other. The court held a hearing on the motions on April 29, 2014. In the court's judgment, the court confirmed it held a hearing on the motions and denied them "[f]or the reasons stated on the record." However, appellant did not order that hearing to be transcribed and, thus, we do not know what was presented or the reasons why the court denied the motions.

{¶ 61} The duty to provide a transcript for appellate review falls upon the appellant. This is because an appellant has the burden to show error by reference to matters in the record. *State v. Skaggs*, 53 Ohio St.2d 162, 163 (1978). This principle is recognized in App. R. 9(B), which provides that " * * * the appellant shall in writing order from the reporter a complete transcript or a transcript of such parts of the proceedings not already on file as he deems necessary for inclusion in the record * * *." "'When portions of the transcript necessary for resolution of assigned errors are omitted from the record, the reviewing court has nothing to pass upon and thus, as to those assigned errors, the court has no choice but to presume the validity of the lower court's proceedings, and affirm.'" *State v. Locke*, 11th Dist. Lake No.2014−L−053, 2015−Ohio−1067, ¶ 90, quoting *Knapp v. Edwards Laboratories*, 61 Ohio St.2d 197, 199 (1980).

{¶ 62} Because appellant failed to file the transcript of the hearing on his motions to dismiss counsel, there is nothing for us to consider. We thus have no choice but to presume the validity and regularity of the trial court's hearing on the motions and affirm the court's ruling.

20

{¶ 63} Moreover, even if the issue was properly before us, appellant does not reference anything in the record before us supporting his motions to dismiss his counsel, in violation of App.R. 16(A)(7). We are not obligated to comb the record to try to find evidence to support his argument.

{¶ 64} Appellant refers to an exchange between him, the trial court, and his attorney as evidence that the trial court should have dismissed his court-appointed counsel, but, again, he does not cite the record in support. We thus have no idea as to which exchange among the various exchanges he is referring to. In any event, our review of the record does not support his argument.

{¶ 65} "An indigent defendant has the right to professionally competent, effective representation, not the right to have a particular attorney represent him." *State v. Evans*, 153 Ohio App.3d 226, 2003−Ohio−3475 (7th Dist.). In order to warrant substitution of counsel, the defendant must show a breakdown in the attorney-client relationship of such magnitude as to jeopardize the defendant's right to effective assistance of counsel. *State v. Coleman*, 37 Ohio St.3d 286 (1988), paragraph four of the syllabus. "Only in the most extreme of circumstances should appointed counsel be substituted." *State v. Glasure,* 132 Ohio App.3d 227, 239 (7th Dist.1999).

{¶ 66} There must be a legitimate reason for the defendant's lack of confidence in his attorney because good cause for dismissal cannot be determined solely according to the subjective standard of what the defendant perceives. *State v. Julious*, 4th Dist. Scioto No. 96CA2409, 1996 Ohio App. LEXIS 5561, *6 (Dec. 5, 1996). For example, a total lack of communication between the attorney and client could be a basis for substitution of counsel. *State v. Murphy*, 91 Ohio St.3d 516, 523 (2001).

{¶ 67} However, mere hostility, tension, and personal conflicts between a defendant and his attorney are not "a total lack of communication" if those interpersonal problems do not interfere with the preparation or presentation by counsel of a competent defense. *Evans, supra,* at ¶ 32, citing *State v. Henness*, 79 Ohio St.3d 53, 65−66 (1997). Disagreement between the attorney and client over trial tactics or approach also do not warrant a substitution of counsel. *Glasure, supra.* Moreover, a total lack of communication preventing an adequate defense must be a permanent, rather than a temporary, state of affairs between the attorney and the client. *Cowans* at 73.

{¶ 68} We review the trial court's decision regarding substitution of counsel for an abuse of discretion. *State v. Williams*, 99 Ohio St.3d 493, 2003−Ohio−4396, P135.

21

{¶ 69} During one exchange between appellant, his attorney, and the court, which took place during jury selection, while the jury was not present, appellant blurted out: "I don't feel he should be my lawyer. I don't feel he's for me. * * * I don't feel comfortable with him." When the judge asked him if his attorney had not done something he wanted him to do, he said his attorney did not get Ms. Crutcher's medical records or the preliminary hearing transcript. However, counsel told the court he had already obtained and reviewed both.

{¶ 70} During another exchange, after appellant's attorney finished cross-examining Ms. Crutcher and while the jury was still empaneled [sic], appellant blurted out, "I don't want him as my lawyer." After the court removed the jury, appellant told the court that he did not want his attorney to represent him because he was "reeking of alcohol." Following this exchange, the court told appellant that he had smelled his attorney's breath and that, not only did it not reek of alcohol, he did not detect a scintilla of alcoholic beverage on his breath. In finding appellant's complaint was not legitimate, the court found that appellant "will resort to lying in order to disrupt the trial, in order to get [his attorney] off the case."

{¶ 71} Significantly, the record reflects that during his cross-examination of the state's witnesses, appellant's counsel regularly consulted with appellant. Thus, there was no "total lack of communication [between attorney and appellant] preventing an adequate defense."

{¶ 72} Based on our review of the record, appellant was uncooperative with the mental health experts, the court, and his counsel throughout the proceedings. He seemed determined to delay and disrupt the trial, and even lied to the court about his attorney drinking alcohol during trial in order to remove him. Despite appellant's wild and baseless accusations concerning his attorney, counsel aggressively cross-examined the witnesses and presented a sound and competent defense. Appellant's animosity toward his attorney was based on his personal feelings toward him, rather than any actual deficiency in his performance as counsel. Thus, even if the issue was properly before us, the trial court did not abuse its discretion in not removing counsel.

*Bolden*, 2016 WL 3573879, at *7-9.

As noted above, a federal habeas claim is procedurally defaulted where the state courts did not reach the merits of the claim because the petitioner had failed to comply with a state procedural rule. *See, e.g., Wainwright*, 433 U.S. at 84-87. Accordingly, the Sixth Circuit has held that a petitioner's failure to comply with Ohio Appellate Rule 9(B)'s requirement that appellants

file supporting transcripts is an adequate and independent state ground to bar federal habeas review of the petitioner's claim. *See Onunwor v. Moore*, 655 Fed. Appx. 369, 373-74 (6th Cir. 2016); *Gonzales v. Wolfe*, 290 Fed. Appx. 799, 804-05 (6th Cir. 2008).

Moreover, because Bolden's substitution-of-counsel claim arises out of the record of proceedings in the trial court, Ohio's *res judicata* doctrine now prohibits him from raising the claim in any state post-conviction proceeding. *See Wong v. Money,* 142 F.3d 313, 322 (6th Cir. 1998) ("Under Ohio law, the failure to raise on appeal a claim that appears on the face of the record constitutes a procedural default under the State's doctrine of res judicata."); *State v. Perry*, 10 Ohio St. 2d 175 (Ohio 1967) (holding that *res judicata* bars a criminal defendant from raising in post-conviction proceedings those claims that could have been raised on direct appeal). And with no state-court remedies still available to him, Bolden has procedurally defaulted the claim. *See Gray v. Netherland*, 518 U.S. 152, 161−62 (1996) ("Because the exhaustion requirement 'refers only to remedies still available at the time of the federal petition,' . . ., it is satisfied 'if it is clear that [the habeas petitioner's] claims are now procedurally barred under [state] law' . . . ." (internal citations omitted)); *Alley v. Bell*, 307 F.3d 380, 385 (6th Cir. 2002) ("[I]f an unexhausted claim would be procedurally barred under state law, that claim is procedurally defaulted for purposes of federal habeas review.").[3]

---

[3]  Additionally, the existence of an alternative merits analysis does not excuse a procedural default when the state court clearly and expressly relied on a procedural bar, as the state appellate court did here. *See Harris v. Reed*, 489 U.S. 255, 264 n.10 (1989) ("[A] state court need not fear reaching the merits of a federal claim in an alternative holding. By its very definition, the adequate and independent state ground doctrine requires the federal court to honor a state holding that is a sufficient basis for the state court's judgment, even when the state court also relies on federal law."); *Scott v. Mitchell*, 209 F.3d 854, 865 (6th Cir. 2000) ("*Harris* does not preclude a finding that the state procedural rule was actually enforced where the state court decision also relies on an alternative ground."); *Coe v. Bell*, 161 F.3d 320, 330 (6th Cir. 1998) ("Coe claims that the court

Bolden does not offer an excuse for the claim's default. He did raise an ineffective-assistance claim regarding appellate counsel's failure to provide the transcripts in his state-court application to reopen his direct appeal. (R. 7-1, Ex. 29.) And, attorney error that constitutes ineffective assistance of counsel may constitute cause to excuse the procedural default of a habeas claim. *Coleman v. Thompson*, 501 U.S. 722, 754 (1991). But claims of ineffective assistance of counsel cannot provide cause for the procedural default of another claim if the ineffective-assistance claim itself is procedurally defaulted. *Edwards v. Carpenter*, 529 U.S. 446, 453 (2000). Although "that procedural default may [] *itself* be excused if the prisoner can satisfy the cause-and-prejudice standard with respect to *that* claim." *Id.* (emphasis original).

Bolden's appellate counsel ineffective-assistance claim regarding the transcripts is procedurally defaulted, because Bolden did not appeal the court of appeals' judgment, depriving the Ohio Supreme Court of "a full and fair opportunity to rule on [his] claim[]." *Manning v. Alexander*, 912 F.2d 878, 881 (6th Cir. 1990). And Bolden does not provide a cause for this default. Thus, Bolden's claim of appellate counsel ineffective assistance based on a failure to provide supporting transcripts to the appellate court is procedurally defaulted and cannot serve as cause for the default of his substitute-counsel claim.

Bolden also does not assert that the default should be excused under the "fundamental miscarriage of justice," or "actual innocence," exception to the cause and prejudice requirement.

---

of appeals's alternative holding—the he would lose on the merits anyway—means that he is not procedurally barred, because the state courts in fact reached the merits. This argument fails due to the Supreme Court's decision in *Harris* ....").

Nor has he presented any new, reliable evidence to demonstrate that he is actually innocent of the crime for which he was convicted.

The court finds, therefore, that Bolden's second ground for relief is procedurally defaulted and recommends that it be dismissed for that reason.[4]

### C.        Ground for Relief Three: *Manifest Weight of the Evidence*

In his third ground for relief, Bolden argues that his convictions were against the manifest weight of the evidence. (R. 1-1; R. 9 at 12-14.) Respondent argues Bolden's manifest-weight claim is not cognizable on habeas review. (R. 7 at 15-18.)

---

[4] Even if Bolden's substitution-of-counsel claim were not procedurally defaulted, it still would fail. The Sixth Amendment right to effective assistance of counsel includes the "right of a defendant *who does not require appointed counsel* to choose who will represent him." *United States v. Gonzalez-Lopez*, 548 U.S. 140, 144 (2006) (emphasis added). However, "[t]he right to counsel of *choice,* unlike the *right* to counsel . . . is not absolute." *United States v. Iles*, 906 F.2d 1122, 1130 (6th Cir. 1990) (emphasis original). And "[a]n indigent defendant has no right to have a particular attorney represent him and therefore must demonstrate 'good cause' to warrant substitution of counsel." *Id.* In *Martel v. Clair,* 132 S. Ct. 1276 (2012), the Supreme Court held that the appropriate standard to employ in considering non-capital defendants' motions for substitute counsel is the "interests of justice" standard. *Id.* at 1284, 1287. It explained that although this standard "contemplates a peculiarly context-specific inquiry," courts generally consider:  "the timeliness of the motion; the adequacy of the district court's inquiry into the defendant's complaint; and the asserted cause for that complaint, including the extent of the conflict or breakdown in communication between lawyer and client (and the client's own responsibility, if any, for that conflict)." *Id.* Here, the trial court conducted a hearing into this matter and denied Bolden's motions. On review, the state appellate court reasonably determined, after examining the record, that during trial, Bolden was "uncooperative" with counsel and disruptive; there was no breakdown in communications between Bolden and his counsel; his attorney "aggressively cross-examined the witnesses and presented a sound and competent defense"; and Bolden's accusations against his attorney were "wild and baseless." *Bolden*, 2016 WL 3573879, at *9. The appellate court's decision, therefore, neither misconstrued nor misapplied Supreme Court precedent, and this claim lacks merit.

It is well-settled that claims regarding the manifest weight of the evidence are grounded in state law and are therefore not cognizable on federal habeas review. *See, e.g., Walker v. Engle*, 703 F.2d 959, 969 (6th Cir. 1983) (Due Process Clause does not provide relief for defendants whose convictions are against the manifest weight of the evidence, but only for those convicted without sufficient proof to allow a finding of guilt beyond a reasonable doubt). The court finds, therefore, that Bolden's third ground for relief is not cognizable on federal habeas review and should be dismissed.

### D.     Ground for Relief Four: *Sufficiency of the Evidence*

Bolden's fourth ground for relief alleges the trial court erred by denying his motion for acquittal because the State "failed to present sufficient evidence" to support his conviction. (R.1-1; R. 9 at 14-15.) Respondent contends this claim is procedurally defaulted because Bolden did not fairly present it to state courts. (R. 7 at 25-27.) The court disagrees.

Respondent argues the state appellate court, the last state court to address Bolden's sufficiency claim, found that Bolden had waived the claim by "fail[ing] to argue any facts in support of [it]." (R. 9 at 25.) In order to find a claim procedurally defaulted, however, the state court must have "clearly and expressly state[d] that its judgment rest[ed] on a state procedural bar . . . ." *Harris v. Reed*, 489 U.S. 255, 263 (1989). The state appellate court here did not do that. After explaining Ohio law governing sufficiency claims, it stated:

> {¶ 79} First, we note that appellant presented no argument challenging the sufficiency of the evidence. Specifically, he did not argue that the state's evidence was lacking with respect to any of the elements of felonious assault. For this reason alone, appellant's sufficiency argument lacks merit. In any event, appellant concedes Ms. Crutcher suffered serious physical harm, and we agree with the trial court's finding that the state presented ample evidence in support of each element of felonious assault.

*Bolden*, 2016 WL 3573879, at *10. The court did not clearly and expressly invoke the waiver rule. Rather, it concluded the claim lacked merit, because Bolden did not present proper argumentation, and, "[i]n any event," could not prevail on the claim as each element of felonious assault was supported by "ample evidence." *Id*. The state court reached the merits of Bolden's sufficiency claim, and the claim is therefore preserved for federal habeas review.

The Due Process Clause of the Fourteenth Amendment requires a state to prove every element of a crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 315–16 (1979). A federal habeas court must determine "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id*. at 319 (emphasis original). "[T]he *Jackson* inquiry does not focus on whether the trier of fact made the correct guilt or innocence determination, but rather whether it made a rational decision to convict or acquit." *Herrera v. Collins*, 506 U.S. 390, 402 (1993). In reviewing sufficiency claims, federal habeas courts "do not reweigh the evidence, re-evaluate the credibility of witnesses, or substitute [their] judgment for that of the jury." *Brown v. Konteh*, 567 F.3d 191, 205 (6th Cir. 2009).

Because both *Jackson* and AEDPA apply to Bolden's sufficiency claim, federal habeas review requires deference at two levels. "'First, deference should be given to the trier-of-fact's verdict, as contemplated by *Jackson*; second, deference should be given to the [state court's] consideration of the trier-of-fact's verdict, as dictated by [the] AEDPA.'" *Davis v. Lafler*, 658 F.3d 525, 531 (6th Cir. 2011) (quoting *Tucker v. Palmer*, 541 F.3d 652, 656 (6th Cir. 2008)). The Sixth Circuit has explained:

> When reviewing whether the state court's determination was "objectively unreasonable," this court necessarily engages in a two-step analysis. First, we must ask whether the evidence itself was sufficient to convict under *Jackson*. The inquiry ends if the panel determines that there was sufficient evidence to convict [the petitioner]. If we find that the evidence is insufficient to convict, we must then apply AEDPA deference and ask whether the state court was "objectively unreasonable" in concluding that a rational trier of fact could find [the petitioner] guilty beyond a reasonable doubt.

*Stewart v. Wolfenbarger*, 595 F.3d 647, 653 (6th Cir. 2010). The circuit court has observed that "'[a] defendant who challenges the sufficiency of the evidence to sustain his conviction faces a nearly insurmountable hurdle.'" *Davis,* 658 F.3d at 534 (quoting *United States v. Oros*, 578 F.3d 703, 710 (7th Cir. 2009)).

Bolden has not met this burden. The trial court instructed the jury that in order to convict Bolden of felonious assault under Ohio Revised Code § 2903.11(A)(1), they had to find that he "knowingly caused serious physical harm to Cathylean Crutcher." (R. 10-2 at 202 (trial transcript).) The appellate court noted – and Bolden does not dispute – that he conceded Ms. Crutcher suffered serious physical harm. *Bolden*, 2016 WL 3573879, at *10. It further concluded that Bolden's conviction was supported by "ample evidence." *Id*. Bolden does not claim any of the court's factual findings are clearly erroneous, nor does he present any argument to refute the court's conclusion.

As the state court reasonably determined, "the jury, as the trier of the fact, was entitled to decide, as it obviously did, that the testimony of the state's witnesses was more credible than that of [Bolden], a career criminal with a prior conviction of attempted felonious assault who was on post-release control at the time of this offense." *Id*. at *11. Those witnesses included Ms. Crutcher, who testified in detail about the events leading up to the assault. She described

28

Bolden's "fit of rage because he thought her children's father had called her." *Id*. at *5. And she recounted his increasingly violent behavior until finally he "punched her with a closed fist in the jaw on the right side of her face" and she "heard her jaw crack . . . ." *Id*. at *2-3. Captain Walters described Bolden's desperate efforts after he was arrested to persuade Ms. Crutcher to change her account of the incident and absolve him, including calling her 1,109 times and writing her about 50 letters. *Id*. at *4. Bolden's testimony, on the other hand, "was internally inconsistent and confusing." *Id*. at *5. He denied getting into an argument with Ms. Crutcher, but also testified that she grabbed his phone and hit and kicked him in the doorway. *Id*. He said they slipped in the doorway, but also that they never fell or hit the ground. *Id*. Bolden also admitted he wrote letters from jail to Ms. Crutcher saying he was jealous and asking her to change her testimony. *Id*.

It is clear from this evidence that "[a] rational trier of fact could have found the essential elements of [felonious assault] beyond a reasonable doubt." *Jackson,* 443 U.S. at 319. The state appellate court's decision, therefore, was neither contrary to, nor an unreasonable application of, *Jackson*, and the court recommends that Bolden's fourth ground for relief be denied as meritless.

## CONCLUSION AND RECOMMENDATION

For the reasons stated above, it is recommended that Petitioner Errick Bolden's petition for writ of habeas corpus (R. 1) be denied in its entirety, because the claims raised are procedurally defaulted, not cognizable on federal habeas review, and/or lack merit.

Date:   October 17, 2018                            *s/ David Ruiz*_____
                                                    David A. Ruiz
                                                    United States Magistrate Judge

**OBJECTIONS**

Any objections to this Report and Recommendation must be filed with the Clerk of

Courts within fourteen (14) days of mailing of this notice. Failure to file objections within the

specified time WAIVES the right to appeal the Magistrate Judge's recommendation. *See Thomas*

*v. Arn*, 474 U.S. 140 (1985); *see also United States v. Walter*s, 638 F.2d 947 (6th Cir. 1981).